IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Patty S. Seymour,                    :

          Plaintiff,                 :

     v.                              :     Case No. 2:16-cv-0744

Commissioner of Social Security,:         JUDGE ALGENON L. MARBLEY
                                           Magistrate Judge Kemp
          Defendant.                 :

## REPORT AND RECOMMENDATION

### I.   Introduction

     Plaintiff, Patty S. Seymour, filed this action seeking
review of a decision of the Commissioner of Social Security
denying her application for supplemental security income.  That
application was filed on December 20, 2012, and alleged that
Plaintiff became disabled that day.

      After initial administrative denials of her claim,
Plaintiff was given a hearing before an Administrative Law Judge
on January 6, 2015.  In a decision dated February 8, 2015, the
ALJ denied benefits.  That became the Commissioner's final
decision on May 31, 2016, when the Appeals Council denied review.

     After Plaintiff filed this case, the Commissioner filed the
administrative record on October 4, 2016.  Plaintiff filed a
statement of errors on January 30, 2017, to which the
Commissioner responded on May 15, 2017.  Plaintiff did not file a
reply brief, and the case is now ready to decide.

### II.  Plaintiff's Testimony at the Administrative Hearing

     Plaintiff, who was 54 years old as of the date of the
hearing and who has a high school education but who was also in
special classes, testified as follows.  Her testimony appears at
pages 51-66 of the administrative record.

     Plaintiff was first asked about her living situation.  She

resided by herself in Section 8 housing in Chillicothe.  She had a friend who would take her places, as would her son.  She did not cook, but family members brought her food.  She testified about her high school education, noting that she was in separate classes and never learned to read.  She never worked full-time but did work in order to get financial assistance from the State.  She did light cleaning at a Legal Aid office.

Plaintiff said that she could not work because she was afraid to be out in the community.  She had been abused as a child.  She did go to church occasionally and she shopped, but only when someone else took her.  Plaintiff said that she sought counseling in 2011 or 2012 due to relationship problems, but she had told her more recent counselor about the childhood abuse.  She was doing better with medication and after separating herself from the other person in her relationship.

### III.  The Medical Records

The pertinent medical records - those relating to Plaintiff's mental impairments - are found beginning at page 339 of the administrative record.  They can be summarized as follows.

Chronologically, the first report comes from Dr. Yee, a psychologist who evaluated Plaintiff in February, 2011.  Plaintiff told her that she had a history of depression dating back to her school days.  She denied any history of substance abuse.  Her social presentation was appropriate but withdrawn and some psychomotor retardation was noted.  Her full-scale IQ was measured at 67.  Dr. Yee rated Plaintiff's GAF at 65 and thought that Plaintiff would be a good candidate for vocational training once her mood was stabilized (Tr. 501-10).  Several years later, Dr. Yee was asked to fill out a mental residual functional capacity report, and she described Plaintiff as having a large number of marked impairments, plus an extreme limitation on her ability to deal with work stress.  (Tr. 513-14).

-2-

Next, the record contains a report from Dr. Peterson, also a consultative examiner, who evaluated Plaintiff on March 25, 2013. Plaintiff reported that she was unable to work due to an inability to read and write and because of past abuse. She said that she was a "slow learner" when in school. She was not taking any medication at the time of the evaluation. Plaintiff told Dr. Peterson that she had lost jobs in the past due to her learning difficulties but that she got along well with coworkers and supervisors. She had gone to counseling in the past, but not since 2008. On a daily basis, she did word searches, household chores, and went shopping. She did some socializing with a friend who took her to the store and helped her to pay bills. Dr. Peterson observed that she had difficulty responding to questions and that she had to be redirected frequently. Her mood appeared mildly dysphoric. She occasionally felt depressed but said that her mood was normal most of the time. Sometimes she had nightmares. Dr. Peterson noted that her concentration and persistence on tasks was poor. On testing, she scored 53 on the IQ scale and her working memory composite score was very low. Dr. Peterson diagnosed a learning disorder, borderline intellectual functioning, and a personality disorder with dependent features. She rated Plaintiff's GAF at 60 for symptoms and 50 for functioning and concluded that she could complete simple tasks if directions were repeated and clearly communicated; that she could maintain concentration and persistence for such tasks; that she would perform best in an environment where there was limited contact with others; and that there would be limits on her ability to respond appropriately to stress and pressure in a work setting. (Tr. 370-76).

Prior to that evaluation, Plaintiff had been seen for a diagnostic assessment in 2011 for assistance in maintaining sobriety. She then attended a number of counseling sessions

which focused on drinking and relationship issues. An updated assessment was done in October, 2012, and shows a diagnosis of alcohol dependence in remission and personality disorder. Her GAF was rated at 56 at that time and notes showed difficulties maintaining social relationships and a learning disability. (Tr. 402). After that assessment, she attended counseling sessions on an inconsistent basis and was not making much progress toward her goals. (Tr. 417). She began seeing a new counselor on February 9, 2013, and a different one several weeks later. The initial sessions with those counselors dealt with relationship issues and substance abuse. (Tr. 472-83). Later in 2013, Plaintiff commented to a provider that she was not interested in treatment for any PTSD symptoms and that she simply wanted to see a doctor and receive medication so she could get SSI benefits. (Tr. 558).

In 2014, Plaintiff received treatment at Fairfield Healthcare Professionals in Lancaster, Ohio. Her diagnoses included major depression and anxiety. She was treated with various medications and told to follow up with counseling. Medications seemed to help, but a note from Melanie Lint, a CNS, dated July 9, 2014 said that she was still unable to work. (Tr. 519). Ms. Lint had rated Plaintiff's GAF at 50 in a note from December 3, 2013. (Tr. 525-26). Other notes from a counselor dated 2014 show that Plaintiff reported she was doing well and was socializing and getting involved in activities but was still having relationship issues.

Dr. Yee wrote a letter on December 9, 2014, indicating she met with Plaintiff as a follow-up from the 2011 evaluation. She reported that Plaintiff had symptoms of depression and anxiety and was easily emotionally overwhelmed. Dr. Yee believed that the records from Ms. Lint supported the presence of depressive symptoms since 2011, and she reaffirmed her conclusion that Plaintiff had marked impairments in the areas of cognitive

-4-

functioning, emotional functioning, and social functioning, and
that she could not sustain an 8-hour workday. (Tr. 543-46).
Also in December, 2014, Plaintiff's counselor, Beth Whalen,
filled out a functional capacity form indicating many marked and
extreme limitations. She also rated Plaintiff's GAF at 48 (Tr.
661-63).

State agency psychologists or physicians also reviewed the
records and expressed opinions about Plaintiff's functional
capacity. Dr. Rudy concluded that Plaintiff had severe
impairments but that any limitations were moderate (except for a
marked inability to understand and remember detailed
instructions) and that she could carry out simple tasks as long
as she did not have to sustain high levels of social interaction.
(Tr. 84-86). Dr. Demuth mostly agreed, indicating that Plaintiff
also could adapt to infrequent changes in a relatively static
work environment. (Tr. 98-101). Both of these opinions were
rendered in 2013, without the benefit of subsequent treatment
records or opinions.

IV. <u>The Vocational Evidence</u>

Carl Hartung testified as the vocational expert in this
case. His testimony begins at page 67 of the administrative
record.

Mr. Hartung was first advised by the ALJ that there was not
any past relevant work. Next, Mr. Hartung was asked questions
about a hypothetical person who could work at all exertional
levels but who could understand, remember, and carry out only
simple instructions and make judgments on simple work. The
person could also respond appropriately to usual work situations
in a routine work setting that is repetitive from day to day with
few and expected changes and could have occasional interaction
with supervisors and coworkers on trivial matters. Also, the
individual could not deal with high production quotas such as

-5-

piece work or assembly line work, nor could the person do work with strict time requirements.

In response, Mr. Hartung said that such a person could do jobs like kitchen helper, which is performed at the medium exertional level, as well as laboratory equipment cleaner and cook's helper. He gave numbers for these jobs as they exist in the national economy. Mr. Hartung also testified that if the person in question had to be taught tasks as opposed to reading instructions, that would not reduce the number of unskilled jobs that the person could do. The jobs he identified also did not require adding or subtracting numbers, nor did they involve contact with the general public.

The ALJ then asked Mr. Hartung how the need for a supervisor or coworker to monitor job performance on a regular and continuous basis would affect the ability to do those jobs. He said that such supervision would not be tolerated in the workplace. He also testified that more than ten absences per year would preclude the performance of unskilled work, as would being off task for more than 10% of the workday.

V.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 18-34 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. Going to the next step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including a learning disorder, borderline intellectual functioning, a personality disorder, and a depressive disorder. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff could work at all exertional levels.  However, she had various nonexertional limitations, including being able to understand, remember, and carry out only simple instructions and make judgments on simple work, being able to respond appropriately only to usual work situations in a routine work setting that is repetitive from day to day with few and expected changes, and being able to have only occasional interaction with supervisors and coworkers on trivial matters.  Also, she could not deal with high production quotas such as piece work or assembly line work or work with strict time requirements and she had to be taught tasks one on one as opposed to reading them.  Finally, she could occasionally complete basic math, defined as addition and subtraction of two-digit numbers.

The ALJ found that Plaintiff had no past relevant work. With the restrictions he identified, however, the ALJ concluded that Plaintiff, could perform the jobs about which the vocational expert testified, including kitchen helper, laboratory equipment cleaner, and cook helper.  He also found that these jobs exist in significant numbers in the national economy.  Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

VI.  Plaintiff's Statement of Errors

In her statement of errors, Plaintiff raises two issues. She argues that (1) the ALJ's residual functional capacity assessment was not based on substantial evidence, and (2) the ALJ did not properly weigh the GAF scores.  The ALJ's decision is reviewed under this legal standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402
U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v.
NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere
scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th
Cir. 1976).  The Commissioner's findings of fact must be based
upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435
(6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th
Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir.
1984).  In determining whether the Commissioner's decision is
supported by substantial evidence, the Court must "'take into
account whatever in the record fairly detracts from its weight.'"
<u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d
383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>,
340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human
Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court
would reach contrary conclusions of fact, the Commissioner's
decision must be affirmed so long as that determination is
supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708
F.2d 1058, 1059 (6th Cir. 1983).

A.  <u>Residual Functional Capacity</u>

Plaintiff first argues that the ALJ erred by focusing almost
exclusively on an apparent improvement in Plaintiff's condition
in the latter half of 2014, to the exclusion of the earlier time
period, which is also encompassed within her claim for
disability.  She asserts that the ALJ must have disregarded, and
therefore failed to explain, the evidence showing the state of
her mental condition from her application date of December 20,
2012, through the middle of 2014, and that his opinion is
therefore not based on substantial evidence.  She does not
dispute the ALJ's conclusion that records from 2014 show a
brighter affect and a less depressed mood after being prescribed
Lexapro, nor that the treatment notes show that she felt ready to

take control over her life.

The Court finds the Commissioner's counter-argument on this point to be persuasive. As the Commissioner notes, from December, 2012, to December, 2013, Plaintiff did not seek treatment for depression or anxiety. She was in counseling, but its focus was on alcohol abuse and relationship issues, and she was not taking any medication for mental impairments. Within a few months after beginning treatment, her condition improved, and it remained good throughout 2014. In addition to analyzing the records for that time period, the ALJ considered and gave significant weight to the opinion of the consultative examiner, Dr. Peterson, who conducted her evaluation of Plaintiff on March 25, 2013, and gave great weight to the opinions of the two state agency reviewers, both of whom expressed those opinions in 2013. The ALJ also extensively summarized and evaluated Plaintiff's activities of daily living throughout the relevant time period, as well as the statements made by Plaintiff about her psychological limitations and her motivation for seeking treatment, and concluded, based on all of the evidence, that although Plaintiff was perhaps more limited in the area of social functioning than the opinions of the state agency reviewers suggested, she could still adapt to simple, routine work as described in the questions asked to the vocational expert. In short, the premise of Plaintiff's argument - that the ALJ simply disregarded any evidence about the severity of her mental impairments from 2013 and early 2014 - is not borne out by the record.

It is important to remember that the ALJ is the primary fact-finder in a social security case. As the Court of Appeals has repeatedly pointed out, deference is due to an ALJ's factual determinations "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the

ALJ." <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997).  That
is the case here.  Consequently, Plaintiff's first statement of
error does not provide any basis for reversal of the ALJ's
decision.

## B.  <u>GAF Scores</u>

Plaintiff's only other argument is that the ALJ did not
directly discuss all of the GAF scores found in the record.
According to Plaintiff, her GAF was rated on ten separate
occasions, but the ALJ cited to only four of them, and discussed
only one in depth.  This omission, Plaintiff contends, requires
that the Court remand the case for further consideration of the
totality of the GAF scores.

Again, the Commissioner has the better of this argument.  It
is correct that an ALJ is not required to discuss each item of
evidence separately, and Plaintiff has cited no cases holding or
implying that the failure to discuss one or more GAF scores in
the record is automatically reversible error.  The ALJ did
consider the opinions of all, or almost all, of the sources who
rated Plaintiff's GAF, and cited to several of them in his
decision.  Only a few were below 50, and as the Court of Appeals
noted in <u>Kornecky v. Comm'r of Social Security</u>, 167 Fed.Appx.
496, 511 (6th Cir. Feb. 9, 2006), "a 51-60 reflects the opinion
that the subject has moderate symptoms or moderate impairment of
social or occupational functioning."  That is what the ALJ found
here.  Further, the <u>Kornecky</u> court also commented that "we are
not aware of any statutory, regulatory, or other authority
requiring the ALJ to put stock in a GAF score in the first
place." <u>Id</u>.  This Court has recognized that GAF scores, while
perhaps helpful in assessing a social security claimant's level
of functioning, provide only a "snapshot" of that functioning and
do not correlate directly to the disability criteria used by the
Social Security Administration.  <u>See, e.g., Comberger v. Colvin</u>,
2015 WL 5013721 (S.D. Ohio, July 28, 2015), <u>adopted and affirmed</u>

2015 WL 5004596 (S.D. Ohio Aug. 24, 2015). The Court therefore finds that the ALJ's failure explicitly to cite and analyze each GAF score in the records is not grounds for reversal or remand.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant Commissioner.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge